Good morning, Justices. My name is Tom Needham, N-E-E-D-H-A-M, and I'm the attorney for Daniel Payne. He's the appellant in this case. Good morning, Mr. Maynard. Good morning, Your Honor. My name is Tom Needham, and I represent Daniel Payne. He's the appellant. There's two reasons why at the agency level the Retirement Board denied Daniel Payne's application for a duty of disability. And the first one was that the Board determined that Payne could perform the duties of a Deputy District Chief even with his shoulder in the condition that it was when we had the hearing. The second issue, the Board concluded as an Mr. Payne, the reason why he couldn't return to work was that, according to the Board, his disability was a direct result of his refusal to have the surgery. What I want to do this morning is focus on just the first issue. And the reason why I'm doing it is in the appellee's brief, in the Board's brief, it is stated at page 13, it's described that that second finding was an alternative conclusion that, quote, is not the basis of the Board's decision. And, you know, in my view of the law, and I cited this case, and I quoted extensively in it, both in this court and in the circuit court, this court in the Lucchese case has already answered or decided that issue very squarely about whether or not the Board is authorized under the law to deny or adjust someone's benefits because they disagree with the health decisions that that person made. So in And I submit it's identical, or as we say, on all fours with this case. It's not even referred to in the appellee's brief. So it seems to me that the real issue before the Court is whether or not the Board was correct when it determined that Payne could go back to work as a Deputy District Chief because his shoulder was fine to perform that job. And that decision was wrong, and it was manifestly erroneous based on the evidence in the record and the case law. The pension statute here requires that when someone applies for a duty disability, that they prove two facts. One, that the applicant is disabled, and two, that the disability was caused by an injury occurred in or resulting from an act of duty. And those two elements are set forth right in the statute. Well, Mr. Needham, the first, your first point is that that's the bone of contention. Simply because he is unable to perform the duties of a firefighter, does that make him disabled within the meaning of the statute, if accommodations, if the Board makes it clear that they're ready to make accommodations for him and his job as a Deputy District Commander is a different job than the job of a firefighter? That's a really long question, but you get the concept. Sure, I do get the concept. Unfortunately, the Chicago Fire Department doesn't have light duty positions for firemen or people who can return to work with a shoulder condition that limits their ability to carry weight or to actively fight fires. They just don't. I know there's cases out there that... Your client's job as a Deputy District Commander, whatever his title was, he was an administrator. He did other things, and we agree with that. Because his injury occurred in the course of doing one of those other things. But if the Fire Department is ready to offer him a job with modifications, is he still, can he still say, oh, but I'm disabled, I don't want that job? No. If the Fire Department wanted to do that, Daniel Payne at the hearing testified that in spite of his age, and he was 58 at the time of the hearing, and became a firefighter in 1975, he said he still wanted to work up until the time when he... 58 doesn't seem so old to me. No, no, it doesn't. But maybe when you're fighting fires for all those years, although he agrees, Justice He wanted to keep working until he was required by the law to retire. So the point is, in this record, there's no evidence, or no, there was never an indication or a move by the Fire Department to offer Payne that kind of accommodation. And they just don't do that. And I would note, by the way, that... But that's not in the record, though. There's nothing in the record about that. That's true. The record is silent on... I mean, Daniel Payne was on medical leave for one year, and when his retirement came to the functions of a firefighter, he applied for a duty disability pension. But the Fire Department's doctor said he can go back to work with modification. That's what Dr.... What's his name? Motto said. And the Fire Department was willing to take him back to work. So can we infer that that means that they were willing to make modifications, although the record is silent on that specific issue? Their own doctor said you can go back with modification. So they said, okay, fine, he can come back. He's not disabled anymore. And he says, no, I'm still disabled because... Still disabled because I can't do all the things a firefighter does. Okay. Well, Dr. Motto is the doctor who's employed by the board, by that appellee board, who reviews these records and who testified at the hearing. He's not a doctor for the Fire Department. Well, yeah, I understand. And Dr. Motto's testimony was that when I asked him a question about whether or not Daniel Payne could go into a building where there was a fire, he stated no. And his exact testimony was he cannot participate in fire suppression activities. Counsel, let's talk about that. What's the definition of a firefighter as opposed to the definition of a job description of a DDC? Well, a firefighter, a good place to look is in this record, in the functional capacity evaluation that was performed. That's not something that's prescribed or given out by the Fire Department, is it? No. No. So what is, it was your burden to come up with the evidence. Right. So what do you have in your case that shows what the definition of either one of those is? Okay, well, there's Payne's testimony about what he did during his job. He testified very directly in his testimony. He was not refuted by anybody. There's the testimony from Ted Manduber, a battalion chief who was present at the scene when Payne was injured. And when he was asked by Mr. Pennelly about what deputy district chiefs do, one of his answers was they respond to fires. And they respond to the biggest fires. In other words, if a battalion chief calls in, the lingo they use is we call in a box, which is like the biggest fire. Payne is assigned to go there. But responding to a fire is different than actually engaging in firefighting, is it not? Well, I disagree with that. If you're present at the scene of a fire, and you're a firefighter, and you're the highest ranking person on the scene, your job is going to be to supervise and to direct people. Right, not to go into the fire. Your job is to supervise and direct. Right. So if you take yourself upon yourself to go into the fire, the supervision and direction is out the window. Well, I don't think that's true if you're in the fire and there's people working in your command that are moving around. I mean, I guess the point is in the fire department, when these folks show up to the scene of a fire, they're there to help if need be. And what if all heck broke loose and buildings started falling apart and people were running? If Tedman Duber or Dan Payne was standing there, they would be expected to pitch in to help injured people, to move ladders, to move hoses.  It is in the record. Let me ask this. When he became a DDC in 2003, I believe it was, was there a job description? Did he know what the job entailed when he took it? No. His testimony at the hearing was that there was no written job description. He was just promoted, and he started doing the job, which includes administrative functions, but it includes all the things that he said he did, which includes, by the way, on May 10, 2009. I mean, is he an administrator or a bureaucrat when he's 12 feet up on a ladder supervising? No, he's not a bureaucrat, but he was a supervisor. Yeah. He's up on a ladder, and he's observing a training exercise, which is what he's supposed to do. And when a call comes in for the crew to respond to a real fire, not a training exercise, according to the evidence in this record, Payne and the others, everyone's, it's hurry up, it's hurry up. It's time to answer the bell. But what I'm getting to is Dr. Bach, and I think it was Dr. Ehrman or Ehrman, and Dr. Perry of Athletico, they said he's not capable of performing the firefighter's job, which would suggest an active firefighter, not a DDC. Isn't that right? No. I just think when, I think with this job, it's not accurate to say that a deputy district chief shouldn't also be able to fight fires when he's at the scene of a fire. Shouldn't isn't the standard, though. I mean, what's mandated under his job description? Well, there is no written job description for the position of deputy district chief. That's what Payne testified to. But wasn't something entered in evidence that was an 07 description of the job? Right. There is a document, and it's referred to as Exhibit 15, but in that document, which was shown to Payne, and he saw it for the first time on the date of the hearing, he was asked whether or not that was an accurate description of what you do, and he read it on the record, and he said this is about 60 or 70 percent of what I do. This is not accurate. It was a posting issued by a different city agency when apparently there was an opening for this position sometime after. They called it the Notice of Job Opportunity. It was a document entitled Notice of Job Opportunity. Right. And that was the only thing that was discussed in that hearing as a description of his job duties. Isn't that true? That's correct. And even if you want to look at that document, you look in there, and there are a lot of things that are administrative in nature that someone with that job would have to do, but it's also true that that job says you're supposed to be at the scene of hazmats or air and sea rescues and respond to fires. And, you know, when a highest-ranking person on the scene of a fire is present, I submit that the public policy and common sense indicates that we should expect that that person is going to do everything possible to pitch in and to fight a fire and to do everything that's physically necessary not to stand there. You know, these guys aren't in business suits. They're not dressed in casual attire. They're dressed in all the gear that their colleagues are, that they're supervising. Counsel, didn't your client also in his testimony say that he always thought he had a complete tear in his rotator cuff and you just found out at the hearing he did not? I don't recall that. I mean, the record's not, the testimony was not very long. His transcript was 25 or 30 pages. So if he said that, then there's no doubt in this record that he has a torn rotator cuff. But he said he thought he had a complete tear. Right. But he never did. If that's what he said, then his doctor, Dr. Bach, testified it was a partial rotator cuff tear. That was also the diagnosis of Dr. Mara, the independent medical evaluation. So my understanding of that particular injury is until you actually do the surgery and go inside and see, it's not possible to say if something's torn or partially torn or not torn at all. But based on the symptoms here, his treating doctor, who saw him for many months, said he had a partial rotator cuff tear. And by the way, that injury, I don't think there's any dispute in this case that he's legitimately injured. When he went for his functional capacity evaluation on November 4, 2009, that record or that document from Atletico was very, very clear that he was giving it his best. You know, that test is designed to identify the fakers and the malingerers, and Dan Payne is not that. You know, he was doing everything possible to try and succeed. They even commented on the effort he was making. But he can't, according to his treating physician, he cannot lift. He's not supposed to be bearing any weight by lifting his right arm over his shoulder. And he's not supposed to be carrying any weight at all? He's not supposed to be lifting any weight over his right shoulder. And as far as carrying on his right side, I think what the record here indicates is that he's not supposed to carry more than 25 pounds. Okay. So you have the actual conduct of Payne on May 10, 2009 when he was injured. You have the testimony from Duber about how battalion or deputy district chiefs respond to fires. You have Payne's testimony. You have the functional capacity evaluation itself where they're testing him, by the way, for the position of firefighter. And all these reports, if you notice, they're all going back to Dr. Russell, who's the department. Ms. Nathan, let me ask you back to Justice Conner's question earlier. It's your burden of proof to put on the evidence that you need to put on before the board, you know, when this hearing was taking place before the board. What did you do to support your argument that, you know, the supervisory description of what a district superintendent is called upon to do is erroneous or that the job opportunity document that was put in for evidence didn't really fully describe that? What evidence did you put on? All I see is that document and then your client saying, well, that's only 60 to 70 percent of what we actually do. Right. I know. I mean, the prior fact, which in this case would be the board, they get to resolve those conflicts in one way or another, and they resolve them against your client. Right. Isn't it your responsibility to bring in other people or to put on some other expert testimony to show, okay, here's what these guys do with a fire or a hazmat scene, and then we would have more. We can't go back and rewrite the facts. Right. I understand. And you need to give us something in this record. Okay. So you have Payne's testimony, the person who was injured, the person who had this job for almost a decade or a little bit less than a decade when he was submitting his application. He described what his job was. And you also have, by the way, He can't be his own expert, Mr. Needham. I mean, I'm sure he can describe his job description, but there's also the fact that it's in his interest to say certain things. What I'm asking about is something a little bit more objective, like someone who has no interest in the outcome of this but who understands exactly what the duties of either a district director or a firefighter really entails to have that person testify. Did you think of doing that? Well, no. When we appeared for the hearing, I knew that the law required us to prove two facts. One, that he is disabled, and two, that his disability was caused by an injury resulting from an act of duty. It's clear from the record that this particular document, this Exhibit 15, was tendered to the applicant on the date of the hearing. And the other point I want to point out here, one of the ex-officio members of this board is the Deputy Commissioner of the Fire Department. His name is Stewart. He was present for the hearing. According to the court reporter's notes, you can see who's actually present. He does not vote, and he doesn't ask any questions. But if that person, who's a member of the board, had anything to say contrary to what Payne was saying about the nature of his job, then he would have said that. And I think it's fair to infer that Deputy Fire Commissioner Stewart had nothing to say in opposition to Payne. And Stewart, by the way, his name comes up, by the way. There was a case that was decided back in 2003 or 2004 by this court where Stewart's name comes up. Before being the Deputy Fire Commissioner, he was the Chief of Personnel or in charge of personnel for the Fire Department. So he'd have some unique insight into this. But we proved the two prongs or the two tests that we have to prove in this case. And so Dan Payne was entitled to this. I mean, that's your argument. Right. But, you know, Mr. Pinelli said, no, you didn't prove that. So, I mean, my question goes a little bit more, like, isn't there some requirement for you to do more to prove, A, I think that we can all agree that his injury was caused on the job by the fall. I don't think anybody is disputing that, even the board. The question is, is he disabled within the meaning of the statute and, you know, well-established Illinois law. And therein lies the problem because saying he's disabled is a different thing than proving it. I understand. But when his testimony about the job has not been rebutted by any witness, including anyone that can look at this Exhibit 15 and say, yes, this is accurate and this job is totally administrative, then the board doesn't have the authority, even under the manifest way to the evidence standard, to just, you know, ignore or reject that testimony. And the final point I want to make here, I don't want to run into a time situation here, but there's a point I want to leave the justices with. There's something unique about this case. When you look at the previous decisions from this court, which even under the deferential standard that we apply here, this board has been reversed in the past in cases that were cited in my brief, the Lucchese case, Sullivan, Thigpen, Zeen, that's Z-I-E-N, and there's a case called Wilford that's out there, in the last 10 or 12 years. So even under the deferential standard that we're applying here, courts, including this court, has been willing to reverse findings of this board under this standard, and in all of those cases, what the question was about was the extent of the person's injuries. Like, was the person really injured or are they injured as seriously as they claimed they were? You can read the cases and see that. This case is different, because in this case, it does not seem that the board is saying that he's not injured or that there's some problem with the functional capacity evaluation or there's some problem with the opinion of his treating physician. Dr. Motto, in fact, states he cannot participate in fire suppression activities. What's unique about this case is the board is taking upon itself, for the first time that I've seen, to analyze the job and to determine, well, this job is administrative or supervisory, so you don't have to run into a building, even though we know that you're going to be at the scene of a fire. And I just think that that leads to... Isn't that their function? Isn't it the function of the board to determine what the job is of the people who are applying for disabilities so they can determine whether the person is, in fact, disabled for purposes of being able to perform that job? That's their function. Well, it's not been done in any case that I've read in this area of the law. They typically... But that's like when I ask, you know, why are we doing it this way? And someone says, oh, because we've always done it this way. That's usually not a good answer. I mean, I want to know why you don't think that that's the board's function. Because that would lead to what I submit would be a completely unworkable, in fact, impossible and intractable job for the board to determine, okay, this job, Deputy District Chief, we know you're going to be responding to fires because that's right in our own job description we're relying on, but what about if Tedman Duber comes in or someone at his rank, the Battalion Chief, who's one rung below Payne? His job slides a little bit more towards the firefighter function as opposed to the supervisory, and what about someone who's the next one down the line? Counsel, what about the fire commissioner, him or herself? If they had a small tear in their rotator cuff, they'd be entitled to a duty disability as well. If he wanted to apply and go in, the same two-step test should be applied to him. And, by the way, that's a good example because it's in the recent past. It was all over the news, and I know it's not in the record, but I think I'm within my rights to talk about something that's publicly known to people. When the NATO summit was here and the police were out on the street at Michigan Roosevelt and it was all over national TV, the superintendent of police was out there 15 or 20 feet behind the phalanx of men and women who were trying to stop the protesters from getting wherever they wanted to go. He's clearly an administrator or a supervisor, but he's out there doing things that we expect leaders in these organizations to do. And the public has the same right to expect that at the scene of a fire, Dan Payne and anyone else in his rank is going to be up there in front, not a block away on the radio or not giving directions and standing and watching while other people put their life in harm's way. That's just not part of the job. Can I ask you one more question, Counselor? Pursuant to Chapter 40, ILCS, Section 5, 6-112, which talks about what has to be presented at a hearing, do you agree that the burden is for your client to present evidence that his physical condition prevents him from performing any assigned duty? Is that part of what you have to prove? Yes. Right. So, again, you have to prove what his assigned duties are and how he could not perform those. Right. And I submit that the testimony from Payne and the testimony from Duber and the fact that when the fire department was sending Payne to be tested, the functional capacity evaluation they were giving him was for the job of firefighter. You know, all these medical reports were going back to Dr. Russell at the fire department. Nobody was asking that he be tested or analyzed to have a desk job or to be an administrator. Remind me how you established what his assigned duties are. What did you say your evidence of that was? His testimony? His testimony, which was not refuted or opposed by anyone, and, in fact, was corroborated by Mr. Duber. And then just the fact of his injury on May 10, 2009, when he's on a ladder 12 feet off the ground and he has to come down quickly to respond to another call, he could not go out and do that with his current shoulder in this condition because what if he slipped and fell and had to grab? Because what happened here, according to the evidence. Couldn't he supervise in a snorkel? Pardon me? Couldn't he supervise in another piece of apparatus other than going up a ladder? Sure he could if the board wants to. I'm just saying, you're saying that he cannot perform these functions. He cannot supervise from a height. Is that true? Well, if you had to move off that ladder quickly, as he did on May 10, 2009, and you slipped and fell, you'd want to grab yourself the way he did to present a fall from 10 or 12 feet. And I think there's a reason why the statute is written so plainly, requiring us just to prove the fact of a disability and the fact that it was caused by an injury at work, and that's the way the statute's written, and that's the way we should be interpreting these cases and not be having the board or this court determine whether or not this particular job requires you to do something because the next job that's one rung below you in the organization might require something different. And, you know, these are paramilitary-type organizations, police and firefighters. You're going to have 10 or 15 ranks between the top and the people on the front line. So thank you for your time. Mr. Pennelly? Good morning, Your Honors. Again, my name is Vincent Pennelly, P-I-N-E-L-L-I, and I represent the Eppley Retirement Board. And I guess I would start with the fact that the fiduciary duties of this board are to protect the assets of the fund for all of the participants. And as the Supreme Court said in Marconi, that's the highest duty we have, and that duty even takes precedence over the individual interpretation of the code in favor of the beneficiaries, which Mr. Payne is. So the board has a large fiduciary responsibility, and in analyzing a case like this, which I think we all agree this is a question of fact, to be judged under the manifest weight of the evidence standard, which means if there's competent evidence in the record to support the board's decision, it must be affirmed, even if the reviewing court would weigh it differently. On that score, I think the most telling thing to me, which I just heard from the discussion, was what were Mr. Payne's capabilities vis-à-vis that functional capacity evaluation. And if you look at that report closely, you'll see that they actually put him through a series of simulations at that functional capacity evaluation, climbing ladders, pulling weights, lifting things. These were supposed to be simulations of what a firefighter would do in the field. And it's said that he did all of those without any difficulties other than that his heart rate went up, which is a question of conditioning, not of injury. So I point that out only because nobody's disputing that he was returned to work by Dr. Bach, his treating physician, returned to work with certain physical limitations. So the question became for the board, okay, can we match his condition to his job duties and responsibilities as a deputy district chief? Now, as the record makes clear from the testimony of Mr. Payne, there are some 23 DDCs in the department. This is a higher rank. There's firefighter, there's engineer, there's lieutenant, there's captain, there's battalion chief, and then you get to the deputy district chief. Now, I think we can all agree that as you go up those rungs, the responsibilities do change depending on the job. Here, the only written evidence in the record as to what those job duties were so that the board could match his physical capabilities to what his job duties were as they're required to do under the pension code. Article 6, as Justice Connors pointed out, 6.1.12 mandates it. If you can't show that you couldn't perform your assigned duties, then you can't get a disability. You have to show that. That's the burden of proof. In any event, there's no question that what's contained in that job posting are supervisory tasks, command tasks. Are you talking about that notice of job opportunity document that we talked about before with Mr. Needham? That's the job posting you're referring to? I am, Your Honor. And that job posting, by the way, is posted by the city of Chicago. All firemen are hired by the city of Chicago. They go through the hiring process of the Human Resources Department of the city. So that job posting, though it's issued by the city's Department of Human Resources, is a posting for a Deputy District Chief in the Chicago Fire Department. Thank you, Counselor. Are there job descriptions for all levels of firemen in the fire department? Or this all comes from the city? Who promulgates those job descriptions? It would come through the city. And I can't tell you for sure there's written listings as I sit here as to each of those different career service ranks. I know from history at the fund that there's always testimony at a minimum about what the job descriptions are. Although, you've got to agree, that would be helpful, would it not? It certainly would be. It certainly would be. And I would add that the job posting description was put into evidence as a board exhibit. So actually the applicant did not present any written evidence at all as to what the job responsibilities are of a Deputy District Chief. That came through the board's exhibits. So in addition to that, I'd like to just address briefly the purported testimony on this issue because I think it's important. The two people who testified, actually there were three people. And they were the Battalion Chief who testified as to the incident. Then there was the applicant, Mr. Payne's, testimony. And then there was Dr. Meinl's testimony. So let me take those in order quickly. The Battalion Chief merely testified that a Deputy District Chief does, and I'm quoting almost from the transcript, administrative duties, witnesses drills, does, quote, manpower. What does that mean? That means he comes to the scene and he assesses it and says, hey, we need more equipment, we need this kind of equipment, we need more manpower, we need this, we need that. He's the one in charge making those calls, clearly supervisory. That's all the Battalion Chief said. Mr. Payne testified that, first of all, he participates in training drills only voluntarily. In other words, if he chooses to go. He's not ordered. Secondly, if he does go to a fire scene, which there are certain ones he's required to go to, I agree, but he's not required to go to every fire scene. If he does go, he said his duties are to organize, administrate, strategize. Those are his words. All of those words are consistent with that description that was in the job posting. So he did not testify, for instance, that, no, I'm required if I see somebody in jeopardy in a burning building, I have to go in there myself and get them out, or I have to strike the fire, or I have to ventilate, or I have to do whatever other tasks. There's no testimony to that effect. Moreover, there's no testimony or written evidence to any physical demand levels that a Deputy District Chief would have to meet, i.e., does he have to lift 25 pounds once in a while, 50 pounds frequently, whatever. Is it a very heavy demand level like the FCE people use? No evidence of that at all. Now, when you ask about the burden of proof, and Council readily acknowledges it's their burden of proof, the question is, well, what else could they have done? Well, first of all, they could have called one of the 22 other Deputy District Chiefs, I presume, to testify at the hearing and tell the Board, hey, here are the responsibilities. Not done. They could have called somebody from the Department of Human Resources of the city to say, hey, here's what a Deputy District Chief is required to do. It's not just what's in the posting. He's also expected to do X, Y, and Z. Not done. Could they have continued the hearing, asked for some time to present their evidence? I suppose they could have, but they didn't. They chose to rest on the evidence that was presented to the Board. Briefly on this issue of Chief Stewart, first of all, a Board trustee can never be a witness in a hearing. He can't do both functions. So the suggestion that Chief Stewart could have added something as a witness to this is just not right, can't be done. The suggestion that his silence means an assent to something simply can't be done because he didn't sign, he didn't vote. So he didn't assent to anything. Now, on that score, there were four people who voted no. Interestingly enough, two of them are firefighters, two of them city officials. We would have to presume that firefighters who every day perform this job would know what the responsibilities of a Deputy District Chief are. They see it all the time in the field. So in deference to the Board's decision-making authority and responsibilities, you have to give some deference to that, that they know what a Deputy District Chief is required to do. The city officials, the same thing. I mean, they're city officials. I presume they would have some knowledge as to what Deputy District Chiefs are supposed to do. Finally, on Dr. Motto, his testimony is unrebutted. And what he said was, I agree, he said he can't do fire suppression. But what he said he can do is Deputy District Chief duties consistent with that job posting. So that's the testimony of Dr. Motto that's in the record. He is the Board's physician. He's been doing this for near 40 years now. So you have to presume he knows something about what they're required to do. And again, that testimony is unrebutted. So at the end of the day, we feel this record is very clear. The Board would have been derelict in its fiduciary duties had it affirmed the grant of this benefit based on this record. There's just no support for granting a benefit based on this record. I'd like to just briefly touch on this issue of the surgery, only because it is related and I think it's important here. Because what you have is Chief Payne saying, being told by two doctors that, look, if this pain continues, you probably have a small tear. It could easily be remedied by an outpatient surgery, arthroscopic, which you would be out for three to six months and you would likely be able to go back to work. So that's what he's told by two doctors. And he says, I don't want to do the surgery. And on the one hand, he says because even though he's undergone two successful surgeries in the past, which is in the record, but he said he heard where somebody had anesthesia and had a bad outcome. So now I don't want to do it because of anesthesia. Now I would agree that judging whether that's a reasonable basis to refuse surgery, questionable. I mean, you know, on the scale of all of us being faced with that decision, you know, if somebody truly has heard of that experience or been through it, okay, we won't say that's unreasonable. But the second reason was unreasonable. And the second reason was he said, I asked Dr. Bach for a guarantee. I want a guarantee that when I have this surgery, it's going to repair the tear and I'm going to be fine. Well, what did Dr. Bach say? I can't give you a guarantee. What would any doctor say? What does any professional say when they're asked for guarantees? We're not in the business of giving guarantees. We just can't do it. So his refusal to have surgery because he couldn't get a guarantee from a doctor on a surgery that everybody agrees it's unrebutted, motto and Bach, and Mara, who's an orthopedic, says it's not a surgery that entails any greater risk, any unnecessary risk, and that he would likely have a good outcome. That's about as good an evidence, I think, as you could get that a surgery is the type of surgery that if you choose not to have it, you're choosing disability over surgery. And that should not be allowed. So on that score, though, it is an alternative basis of the fund's decision. It's not the only basis. And the, I'm sorry, I'm forgetting the name of the case, but I should know it well. The, excuse me one second. The Lucchese case, remember it well, is quite distinguishable here for a number of reasons, because one, Lucchese had a surgery and he wasn't doing his physical therapy after the surgery, so that was the issue. Two, Dr. Motto said that he couldn't say with any certainty that if he did the physical therapy, it would repair, you know, his shoulder. So, you know, basically he said he was disabled. So that's quite a different situation than we have here. At the end of the day, I'd ask the court to affirm the decision of the circuit court, which we believe was correct, in affirming the decision of the board and the board's denial of this application. Can I ask you a quick question? Sure. On the suggestion made by Mr. Needham that this is somehow going to be an inequity if we rule for the board, I don't know what will happen here, but to the higher rank fire department personnel, some kind of inequity because they're being treated differently than the firefighter, and once a firefighter, always a firefighter, even if you're the commissioner, you might have to go into that burning building. I mean, do you feel that that would be some type of inequity if we ruled on behalf of the board? I do not think it would be an inequity, Your Honor, and I think that the suggestion that somehow as a policy or as a message to the firefighters out there that, you know, decisions could be determined based upon what your actual duties are and all that, there's nothing wrong with that, and it's not inequitable. It comes down to when you come before this board for a disability, the board has fiduciary duties, the board must ensure that there's sufficient evidence in the record, and you better come prepared to present your case, and there's nothing unique about this case that's any different than any other case that comes before the board where evidence is presented as to what your responsibilities are and then what your physical condition is to see if there's a match there. After all, you have to compare apples to apples. You can't do an apples to oranges. Saying a deputy district chief has the same responsibilities and duties as a firefighter is apples to oranges. Well, you stayed up here longer, so now I have to ask you another question. I should have quit when I was ahead. The supervision of training drills such as the one that led to Mr. Payne's injury in this case, is that a routine aspect of the job of a deputy district commander? It appears from the job posting that, yes, one of the things they do is supervise training drills. Of the same kind that he was, in fact, supervising a training drill when he was injured, and so if supervision of training drills and exercises could cause this kind of injury, can he continue to supervise training drills in his current condition? Well, that is the $64 million question. And, again, I get back to can you match what his condition was to what his responsibilities were. Supervising a training drill, it's not like, you know, running. Because you're at a fire scene, you have to run into the building. It's a supervisory position. He testified that he watches, he makes comments, he may critique. He goes up on the ladder also to see what they're doing up there. Right. And, again, that's why I brought up the functional capacity evaluation. They tested him on climbing ladders, and he could do it according to the FCE without any problems. So the problem is there was a lack of evidence here to say that he could not perform those duties, including supervising a training drill. Thank you. Thank you. Mr. Needham, brief rebuttal, please. Emphasis on brief. I'll be brief because Dr. Motto said Payne cannot perform firefighting functions, and yet there doesn't seem to be any disagreement between us that Payne's job as a Deputy District Chief is going to require him to go to fire scenes, to go to hazmats, air and sea rescue incidents. And so, according to the argument from the Board, the Deputy District Chief should be able to show up at those scenes. But if they're asked by one of their colleagues or something of an emergency nature happens and they have to pitch in and do something physical, then Payne or someone in his position is supposed to do what? How do we get around the fact of what I asked you before, and I think Justice Connors asked as well, what evidence did you put on to support your contention that the requirements of the job of the DDC is different than just supervising the way an administrative supervisor would do, just stand around and not do anything physical? Did you put some evidence on other than Mr. Payne's testimony? Because I dispute with you whether he can act as his own expert. I mean, that's kind of what you're saying, and I don't agree with that. He can describe what his own job is. Sure, but what other evidence? Of course he can describe his job description, but the notice of job opportunity, which the Board also put into evidence, describes his job description, and it describes it as less than what he did. And the Board is entitled to resolve that dispute in a way that they think is appropriate, and that's what they did. My question is, other than his testimony and Mr. Payne's testimony, could you have put in somebody else, like Mr. Pennelly suggested, called one of the other 23 battalion chiefs or whoever they are to say, here's what we do, and we don't just stand around. We have to lift hoses or whatever it is that these people do. Sure. Couldn't you have done that? Sure. The question is, at this point, could we have presented a stronger case than yes? But the question for this Court is. No, I'm not asking. I'm just asking. My question is really narrow because you're asking us to overrule the Board. That's a pretty steep hill to climb. And what I'm asking you is what is in the record and what could have been in the record that would allow us to do, in accordance with Illinois law, what you're asking us to do. That's all I'm asking. Okay. So, sure, you could have put on a stronger case, but that's not very narrow. What evidence? Is there other evidence that's not in the record, that should be in the record, about what this guy's job description is that doesn't, that would give us something else to hang our hat on? Okay. If I understand the question, is there some evidence that you can. . . Could you have put on an expert? Could you have put on expert testimony regarding what the duties of Mr. Payne really is, other than his own testimony? Yes, I could have, and we didn't. But the test here is whether or not he has a disability, and secondly whether or not the disability was caused by the job. And that's, when you read all the cases, I've cited them in my brief, and I did it earlier this morning, all those cases I cited, I don't think any of them have any kind of expert witness. You have the applicant or the firefighter going in, describing their job, and the focus has always been in those cases on the extent of the injury, the medical records, and the opinions about the person's condition. And here we're doing something different. We're asked to describe a different standard or ask Mr. Payne to go to the scene of a fire, and if there's some need for him to do something physically, which is very, very possible, I submit, just using our own common sense. And he's supposed to wave around a job description from City Hall. That can't possibly be a just result in this case. Thank you very much. Okay, thank you very much, Mr. Needham. Thank you, Mr. Pinelli. This case will be taken under advisement.